IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2016 AUG 29  P 12: 56

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

MIDAS INTERNATIONAL CORP.,

    Plaintiff,

v.

POULAH INVESTORS, LLC, *et al.*,

    Defendants.

\*

\*

\*

\*

\*

\*

\*

Case No.: GJH-15-2240

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

After termination of their franchise agreement, Plaintiff Midas International Corporation ("Midas") initiated this action against Defendants Poulah Investors, LLC ("Poulah"), Laurent Djampa, Clovis Djeutcha, Atanis Kadjemse, Apolin Pougoum, and Martin Tegangtchouang (the "Individual Defendants"), alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, common law unfair competition, and breach of contract against Poulah, and breach of guarantees against the Individual Defendants. ECF No. 1. Two motions are currently pending before the Court: Midas' Motion for Default Judgment against Poulah, ECF No. 34, and its Motion for Summary Judgment against the Individual Defendants, ECF No. 35. No hearing is necessary to resolve these Motions. *See* Loc. R. 105.6 (D. Md.). For the reasons that follow, both motions are granted, in part, and denied, in part.

## I.    BACKGROUND

Midas is a franchisor of automotive specialty shops that service and install exhaust systems, brake components, suspension parts, heating and cooling system parts, tires, batteries, and other motor vehicle parts, and also performs services in connection with these sales and

performs general vehicle maintenance services. ECF No. 1 ¶ 10; ECF No. 35-1 at1.[1] Midas has

approximately 1,000 franchises in the United States, at least twenty-five of which are in

Maryland, each doing business as "Midas." ECF No. 1 ¶ 11; ECF No. 35-1 at1. The relationship

between Midas and each of its franchisees is governed by a franchise agreement allowing

franchisees to use, for a term of years, Midas' trademarks, service marks, trade dress, and

licensed methods in exchange for, among other things, monthly royalties. ECF No. 1 ¶ 12; ECF

No. 35-1 at 2. Midas is the owner of numerous trademark registrations issued by the United

States Patent and Trademark Office ("PTO"), the first of which was issued in 1957, on various

trade names and service marks, including "MIDAS," "MIDAS MUFFLER," and "MIDAS

MUFFLER SHOPS." ECF No. 1 ¶ 13; ECF No. 35-1 at 2, 9–26. Midas has established

significant goodwill throughout the years it has operated as a franchisor with respect to the goods

and services it offers. ECF No. 1 ¶ 14; ECF No. 35-1 at 3.

On November 7, 1994, Midas entered into a franchise agreement with J&D Automotive,

Inc. ("J&D"), in which Midas licensed the use of its service marks for a twenty-year term (the

"Franchise Agreement" or "Agreement"). ECF No. 1 ¶ 15; ECF No. 35-1 at 3, 27–43. The

Franchise Agreement allowed J&D to assign its rights thereunder to another party, subject to

Midas' consent. ECF No. 35-1 at 34–35. J&D operated a Midas franchise at 8528 Piney Branch

Road in Silver Spring, Maryland (the "Shop") until, on April 1, 2012, J&D assigned the

Franchise Agreement to Poulah (the "Assignment"). ECF No. 1 ¶ 15–16; ECF No. 35-1 at 3; 44–

48. Pursuant to the Assignment, Poulah, as well as the Individual Defendants, agreed to be bound

by the Franchise Agreement. ECF No. 1 ¶ 16; ECF No. 35-1 at 3, 44–48.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Pursuant to the Franchise Agreement, Poulah acknowledged the validity of Midas' trademarks and further acknowledged that the marks are the sole property of Midas, but that Poulah was granted the right to use the marks so long as the Franchise Agreement remained in force. ECF No. 35-1 at 28. The Franchise Agreement further provided that the Midas marks were the exclusive property of Midas and that Poulah was prohibited from using the marks during or after the term of the Agreement except in accordance with the terms of the Franchise Agreement. *Id.* During the term of the Agreement, Poulah agreed to pay Midas monthly royalties of 10 percent of the franchise's total gross revenue. *Id.* at 30. If such royalties were not paid when due, Poulah was obligated to pay interest at a per annum rate of three percentage points above the prime lending rate of the First National Bank of Chicago.[2] *Id.*

The Franchise Agreement specified the obligations of a franchisee after termination of the Agreement. Specifically, the Agreement provided that upon its termination, Poulah was required to, among other things, promptly pay all liquidated damages owed to Midas; immediately discontinue use of any Midas trademarks or service marks; remove or destroy all signs containing any Midas marks, and destroy or surrender to Midas all stationary, letterheads, forms, promotional displays, and advertising containing Midas marks. *Id.* at 39. In the event of default or breach of the Franchise Agreement, Poulah "acknowledge[d] that it would be difficult to ascertain the exact amount of damages incurred by Midas . . . and that . . . Midas shall be entitled to recover from [Poulah] . . . as and for its liquidated damages, the sum of $100.00 for each day's continuance of such breach or default after written notification . . . by Midas . . . ." *Id.* The Franchise Agreement further provided that, in the event Midas was required to obtain

---

[2] After the Franchise Agreement was entered, through a series of mergers, the First National Bank of Chicago was merged with JP Morgan Chase Bank. ECF No. 35-1 at 6, 62–63.

counsel or other legal expenses to enforce any obligations under the Agreement, Midas was entitled to recover attorneys' fees and costs from Poulah. *Id.* at 41.

When they agreed to the Assignment of the Franchise Agreement, the Individual Defendants also executed a personal guaranty whereby they each agreed to be held jointly and severally liable for any payment that would become due to Midas from Poulah (the "Guaranty"). *See* ECF No. 1 ¶ 17; ECF No. 35-1 at 49–50. Pursuant to the Guaranty, the Individual Defendants also agreed to reimburse Midas for "all expenses, collection charges, court costs and attorney's fees incurred in endeavoring to collect or enforce any of the [listed obligations] against [Poulah] and/or [the Individual Defendants] . . . ." ECF No. 35-1 at 49.

When the Franchise Agreement was set to expire in November 2014, Poulah was delinquent in its financial obligations to Midas. *See* ECF No. 1 ¶ 18; ECF No. 35-1 at 5. Midas, however, offered Poulah the opportunity to either renew the Agreement if its default was cured, or to extend the term of the Agreement to give Poulah more time to review its renewal opportunity. ECF No. 1 ¶ 19; ECF No. 35-1 at 5. Poulah did not take advantage of either opportunity, and the Franchise Agreement terminated in accordance with its terms on November 7, 2014. ECF No. 1 ¶¶ 20–21; ECF No. 35-1 at 5–6. Poulah nevertheless continued to operate as a Midas shop. ECF No. 1 ¶ 22; ECF No. 35-1 at 6.

On December 17, 2014, Midas sent a letter to Poulah and the Individual Defendants notifying them of the expiration of the Franchise Agreement. ECF No. 35-1 at 52; *see also* ECF No. 1 ¶ 23; ECF No. 35-1 at 6. As of that date, Poulah was at least $13,587.10 delinquent on its financial obligations to Midas. ECF No. 35-1 at 5; *see also* ECF No. 1 ¶ 18. Midas' December 17 letter reminded Poulah and the Individual Defendants of their post-termination obligations under the Franchise Agreement, and further noted that, if Midas was required to obtain counsel

4

to enforce the terms of the Agreement, the Individual Defendants would be jointly and severally liable for all court costs and attorneys' fees. ECF No. 35-1 at 53–54. Poulah nevertheless continued to operate as a Midas shop, and on January 14, 2015, Midas sent another letter to Poulah and the Individual Defendants demanding that they immediately cease and desist identifying as a Midas business. ECF No. 35-1 at 56–58. In the months that followed, Midas repeatedly urged Poulah and Defendant Kadjemse, who served as Poulah's manager, to cease using Midas' marks and to cease holding itself out as an authorized Midas franchisee. ECF No. 1 ¶ 24; ECF No. 35-1 at 6. Poulah nevertheless continued to use Midas' trademarks, including on the Shop's exterior pole sign, ECF No. 1 ¶ 25; ECF No. 35-1 at 6, 60, until August 9, 2015, when it went out of business without having paid the $13,587.10 it owed to Midas. ECF No. 35-1 at 6.

Midas initiated the present action on July 30, 2015. ECF No. 1. Defendants Pougoum, Tegangtchouang, Djeutcha, and Kadjemse each filed Answers to the Complaint on August 27, 2015. ECF Nos. 20, 21, 22 & 23. After the Court granted multiple motions for extension of time for Defendant Djampa to answer the Complaint, Djampa subsequently consented to the entry of a permanent injunction against him, and Midas then dismissed any claims it had against Djampa with prejudice. ECF No. 31. Additionally, the Court administratively closed this action with respect to Pougoum pursuant to 11 U.S.C. § 362(a) upon receiving notice that Pougoum had filed for bankruptcy relief. *See* ECF Nos. 45 & 48. Poulah failed to respond to the Complaint, and default was entered against it on April 12, 2016.[3] ECF No. 54. Midas' Motion for Default Judgment against Poulah, ECF No. 34, and its Motion for Summary Judgment against the

---

[3] On December 29, 2015, Kadjemse filed a motion for extension of time to file an opposition to Midas' Motion for Entry of Default purportedly on behalf of Poulah. ECF No. 42. On February 2, 2016, the Court terminated that Motion, noting that, Kadjemse, a non-attorney, could not file motions on Poulah's behalf, and that, pursuant to Local Rule 101.1(a), a corporate defendant such as Poulah cannot proceed without counsel. ECF No. 48.

Individual Defendants, ECF No. 35, which now only seeks judgment against Tegangtchouang, Djeutcha, and Kadjemse, *see* ECF No. 53 at 2 n.1, are now pending before the Court. Kadjemse and Djeutcha have opposed Midas' Motion for Summary Judgment, but Tegangtchouang has not. ECF Nos. 51 & 52. Midas filed a combined reply in further support of its Motion for Summary Judgment, ECF No. 53, and, accordingly, both of its Motions are now ripe for review.

## II.     MOTION FOR DEFAULT JUDGMENT AGAINST POULAH

### A.  Standard of Review

"A defendant's default does not automatically entitle the plaintiff to entry of a default judgment: rather, that decision is left to the discretion of the court." *Choice Hotels Intern., Inc. v. Savannah Shakti Carp.*, No. DKC-11-0438, 2011 WL 5118328 at * 2 (D. Md. Oct. 25.2011) (citing *Dow v. Jones*, 232 F.Supp.2d 491, 494 (D. Md. 2002)). Although "[t]he Fourth Circuit has a 'strong policy' that 'cases be decided on their merits,'" *id.* (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir.1993)), "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party[.]" *Id.* (citing *S.E.C. v. Lawbaugh*, 359 F.Supp.2d 418, 421 (D. Md. 2005)).

"Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not." *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 422 (D. Md. 2005). Rule 54(c) of the Federal Rules of Civil Procedure limits the type of judgment that may be entered based on a party's default: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." In entering default judgment, a court cannot, therefore, award additional damages "because the defendant could not reasonably have expected that his damages would exceed th[e] amount [plead in the complaint]." *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 132 (4th Cir. 2000). Where a complaint does not specify an

6

amount, "the court is required to make an independent determination of the sum to be awarded." *Adkins v. Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001) (citing *S.E.C. v. Management Dynamics, Inc.*, 515 F.2d 801, 814 (2nd Cir. 1975); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2nd Cir. 1981)). While the Court may hold a hearing to prove damages, it is not required to do so; it may rely instead on "detailed affidavits or documentary evidence to determine the appropriate sum." *Adkins*, 180 F.Supp.2d at 17 (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)); *see also Laborers' District Council Pension, et al. v. E.G.S., Inc.*, No. WDQ– 09–3174, 2010 WL 1568595, at *3 (D. Md. Apr.16, 2010) ("[O]n default judgment, the Court may only award damages without a hearing if the record supports the damages requested.").

### B. Discussion

In considering a motion for default judgment, the Court accepts as true the well-pleaded factual allegations in the Complaint as to liability, but nevertheless "must determine whether the well-pleaded allegations . . . support the relief sought in th[e] action." *Int'l Painters & Allied Trades Indus. Pension Fund v. Capital Restoration & Painting Co.*, 919 F. Supp. 2d 680, 685 (D. Md. 2013) (citation and internal quotation marks omitted). In the Complaint, Midas alleged three claims against Poulah: breach of contract, trademark infringement in violation of the Lanham Act, and common law unfair competition. ECF No. 1 ¶¶ 28–45. In its Motion for Default Judgment, Midas indicated that it is not pursuing its claim of common law unfair competition, ECF No. 34 at 10 n.1, so the Court will consider Midas' remaining two claims against Poulah in turn.

### 1. Breach of Contract

To prevail on a breach of contract claim in Maryland, "a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach

7

of that obligation by the defendant."[4] *RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (Md. 2010); *see also Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). In the Complaint, Midas alleges that, in the Franchise Agreement, Poulah entered a contractual relationship with Midas whereby Poulah agreed to pay monthly royalties to Midas and to de-identify the auto repair shop as a Midas shop after expiration of the term of the Franchise Agreement. *See* ECF No. 1 ¶¶ 12, 16; *see also* ECF No. 1-3. Midas further alleges that Poulah breached that Agreement by becoming delinquent on its financial obligations before the Agreement expired, and further by failing to take the necessary steps to de-identify as a Midas shop after the Franchise Agreement expired. *Id.* ¶¶ 18, 21–26. Thus, assuming the truth of the well-pleaded allegations in the Complaint, Midas has established Poulah's liability for breach of contract.

## 2. Trademark Infringement

"'To prove trademark infringement, a plaintiff must show both that it has a valid, protectable trademark and that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation,' 15 U.S.C. § 1114(1), creates a likelihood of confusion.'" *Cava Grp., Inc. v. Mezeh-Annapolis, LLC*, No. GJH-14-355, 2016 WL 3632689, at *5 (D. Md. July 7, 2016) (footnote omitted) (quoting *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997)); *see also* 15 U.S.C. § 1114(1)(a) (providing that "[a]ny person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion . . . shall be liable in a civil action by the registrant . . ."). "'[M]any

---

[4] The Franchise Agreement provides that it "shall be governed by the laws of the state in which the shop is located." ECF No. 34-1 at 42. Thus, Maryland law controls interpretation of the Agreement.

courts have held that continued trademark use by one whose trademark license has been

cancelled satisfies the likelihood of confusion test and constitutes trademark infringement.'"

*Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 445 (D. Md. 1998) (quoting *Burger

King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983)); *see also R/C Theatres Mgmt. Corp.

v. Metro Movies, LLC*, 44 F. Supp. 3d 626, 635 (D. Md. 2014); *7-Eleven, Inc. v. McEvoy*, 300 F.

Supp. 2d 352, 356 (D. Md. 2004).[5] Indeed, "[t]here is a high risk of consumer confusion when a

terminated franchisee continues to use the former franchisor's trademarks" because "[c]onsumers

will associate the trademark user with the registrant and assume that they are affiliated. Any

shortcomings of the franchise would therefore be attributed to the franchisor." *Merry Maids*, 33

F. Supp. 2d at 445.

    Here, Midas alleges that it is the owner of numerous trademark registrations issued by the

PTO on various trade names and service marks, including "MIDAS," "MIDAS MUFFLER," and

"MIDAS MUFFLER SHOPS." ECF No. 1 ¶ 13; *see also* ECF No. 1-2. Midas further alleges

that, upon termination of the Franchise Agreement, Poulah continued to operate as a Midas shop,

and continued to use Midas' trademarks, including on the Shop's exterior pole sign, despite

Midas' repeated requests that Poulah cease using its marks. ECF No. 1 ¶¶ 22–26; ECF No. 1-6;

ECF No. 1-7. This continued use after expiration of the Franchise Agreement is sufficient to

create a likelihood of confusion amongst consumers, and, accordingly, suffices to establish

Midas' claim that Poulah infringed on its trademark in violation of 15 U.S.C. § 1114(1).

---

[5] Ordinarily, in a trademark infringement action, a court considers various factors to determine whether there is a likelihood of confusion between two marks, including the strength or distinctiveness of the plaintiff's mark, the similarity of the two marks, the similarity of the goods or services that the marks identify, the similarity of the facilities used by the markholders, the similarity of advertising used by the markholders, the defendant's intent, and whether there is any evidence of actual confusion. *Cava Grp.*, 2016 WL 3632689, at *6. In *R/C Theatres Management Corp. v. Metro Movies, LLC*, however, the court explained that analysis of every factor is unnecessary in cases such as this, where the alleged infringement involves the continued use of a trademark after a license expired. 44 F. Supp. 3d at 635 n.13. Indeed, the factual scenario presented by this case "is unlike many other direct infringement cases because there are not two competing trademarks, only [Poulah's] continued use of [Midas'] trademark." *Id.*

### 3. Damages

Midas seeks judgment in its favor against Poulah in an amount totaling $84,930.56, plus costs and attorneys' fees, and post-judgment interest. ECF No. 34 at 14. Specifically, Midas seeks $13,587.10 in past due amounts owed under the Franchise Agreement; late fees on such past due amounts at a rate of 6.25% from December 17, 2014 through December 15, 2015, totaling $843.46; liquidated damages of $100 per day from December 17, 2014 through August 9, 2015, totaling $23,500, with such amount to be trebled, totaling $70,500. *Id.*

The record supports Midas' request for $13,587.10 in amounts owed under the Franchise Agreement, as well as accrued interest totaling $843.46. In support of its request for damages, Midas submitted the declaration of Anthony Polito, the Franchise Business Consultant for Midas, who attests that Poulah was $13,587.10 delinquent in payments owed to Midas at the time the Franchise Agreement expired, and that Poulah failed to remit such payments before it went out of business on August 9, 2105. ECF No. 34-1 at 5–6. Moreover, the Franchise Agreement provided that any past due amounts would accrue interest at a per annum rate of three percentage points above the prime lending rate of the First National Bank of Chicago, which has since merged with JP Morgan Chase Bank. *Id.* at 6, 30. The record reflects that the relevant prime lending rate at all times relevant to this action was 3.25 percent. *Id.* at 6–7, 65. Thus, the interest rate applicable to Poulah's past due amounts is 6.25 percent, resulting in $843.46 in interest due. *Id.*

Midas next claims that it is entitled to recover liquidated damages as provided by the Franchise Agreement. Under Maryland law, there are three essential elements to an enforceable liquidated damages provision: (1) the clause must provide in clear and unambiguous terms for a

sum certain; (2) it must reasonably compensate for damages anticipated by the breach; and (3) it

may not be altered to correspond to actual damages determined after the fact. *Bd. of Educ. of*

*Talbot Cty. v. Heister*, 896 A.2d 342, 352 (Md. 2006) (citations omitted). Here, the Franchise

Agreement provided, in clear and unambiguous terms, a mechanism by which a specific dollar

amount could be determined at the time of breach: $100.00 per day of breach of the Agreement

after written notification by Midas of such breach. ECF No. 1-3 at 14; *see also Bd. of Educ. of*

*Talbot Cty.*, 896 A.2d at 352 (finding that liquidated damages provision included adequate terms

for a sum certain where damages could be "calculated readily and with certainty as a definite

amount"). This provision is sufficient to fairly compensate Midas without being a grossly

excessive penalty, *see id.*; *see also Allegis Grp., Inc. v. Justin Jordan*, No. CV GLR-12-2535,

2016 WL 1077098, at *6 (D. Md. Mar. 18, 2016) ("The Court may deem a liquidated damages

clause valid, and not a penalty . . . [if] the clause . . . provide[s] a fair estimate of potential

damages at the time the parties entered into the contract . . . and . . . the damages must have been

incapable of estimation, or very difficult to estimate, at the time of contracting."), and it could

not be altered to correspond with actual damages after the fact. Accordingly, the Franchise

Agreement's liquidated damages provision is enforceable against Poulah.

Poulah first received written notice of its default on December 17, 2014, and only ceased

using Midas' marks when it went out of business on August 9, 2015. *See* ECF No. 1-6; ECF No.

34-1 ¶ 27. Thus, for these 235 days during which Poulah continued to improperly use Midas'

trademarks, Midas is entitled to $23,500 in liquidated damages.

Midas furthers claims that it is entitled to treble damages pursuant to 15 U.S.C. § 1117, to

be calculated based on its award of liquidated damages. "Under the Lanham Act, a successful

plaintiff may, 'subject to the principles of equity . . . recover (1) defendant's profits, (2) any

11

damages sustained by the plaintiff, and (3) the costs of the action.'" *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 490 (D. Md. 2012) (quoting 15 U.S.C. 1117(a)).

Additionally, a court "may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). But claims for treble damages—or any damages, for that matter—under the Lanham Act are separate and apart from any liquidated damages to which Midas is entitled for breach of the Franchise Agreement. *See Choice Hotels Int'l, Inc. v. Chewl's Hosp., Inc.*, 91 F. App'x 810, 817 (4th Cir. 2003) (noting that breach of contract and trademark infringement claims are independent claims that are separately compensable); *see also La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 345 (6th Cir. 2010) (finding that award of both liquidated damages for breach of contract and treble damages for trademark infringement was permissible because"[c]laims for breach of contract and trademark infringement are distinct actions, based on separate conduct and addressing disparate harms"); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1566 (11th Cir. 1986) (upholding award of both liquidated damages and trademark infringement damages because such damages were awarded for two "set of wrongs"). When courts award treble damages under the Lanham Act for trademark infringement, the amount that is trebled are the actual damages sustained by the plaintiff, not any liquidated damages that may otherwise have been provided for in a contract. *See McDonald's Corp. v. Dat Do*, No. CIV.A. 00-1592-A, 2001 WL 34042640, at \*4 (E.D. Va. Apr. 30, 2001), *aff'd sub nom. McDonald's Corp. v. Do*, 20 F. App'x 194 (4th Cir. 2001) (noting that the measure of damages for franchisee's post-termination use of franchise marks is "the total franchise service fees which the defendant would have owed under the terminated franchise agreement during the period of post-termination use of the franchise marks"); *see also La*

12

*Quinta*, 603 F.3d at 340; *Ramada Inns*, 804 F.2d at 1563–64. Here, however, Midas has not presented any evidence respecting any actual damages that it may be entitled to for trademark infringement under the Lanham Act. The Court, therefore, has no basis from which it could treble Midas' damages, and thus must deny Midas' request for such damages.[6]

Finally, although "'Maryland follows the common law 'American Rule,' which states that, generally, a prevailing party is not awarded attorney's fees' . . . [c]ourts make exceptions where 'the parties to a contract have an agreement that authorizes recovery of attorney fees.'"[7] *Hearn Insulation & Improvement Co. v. Bonilla*, No. 09-CV-00990-AW, 2011 WL 220091, at *1 (D. Md. Jan. 21, 2011), *aff'd*, 456 F. App'x 311 (4th Cir. 2011) (quoting *Nova Research, Inc. v. Penske Truck Leasing Co.*, L.P., 952 A.2d 275, 281 (Md. 2008)). Here, the Franchise Agreement provided that, in the event Midas was required to obtain counsel or other legal expenses to enforce any obligations under the Agreement, Midas would be entitled to recover attorneys' fees and costs from Poulah. *Id.* at 41. In accordance with Local Rule 109 (D. Md.), Midas shall file a motion for attorneys' fees and costs within fourteen (14) days of the entry of judgment. Additionally, the Court will award post-judgment interest at the statutory rate.[8] *See* 28 U.S.C. § 1961.

---

[6] Additionally, treble damages are not an automatic remedy under § 1117; courts have "a great deal of discretion . . . in fashioning a remedy under this provision." *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 487 (D. Md. 1999) (quoting *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 149–50 (4th Cir. 1998)).

[7] Although the Lanham Act also provides for the recovery of attorneys' fees, such awards are to be given only in "exceptional cases." 15 U.S.C. § 1117(a). "A case is exceptional when the conduct of the losing party is malicious, fraudulent, deliberate, and willful." *Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, No. CIV.A. DKC 13-1128, 2014 WL 857947, at *23 (D. Md. Mar. 4, 2014) (citation and internal quotation marks omitted).

[8] Although Midas has requested post-judgment interest at the contractual rate of 6.25 percent, "[a]fter entry of judgment, interest will accrue at the federal post-judgment interest rate." *Roger E. Herst Revocable Tr. v. Blinds to Go (U.S.) Inc.*, No. CIV.A. ELH-10-3226, 2011 WL 6409129, at *26 (D. Md. Dec. 20, 2011). Although "[p]arties may contract to, and agree upon, a post-judgment interest [rate] other than that specified in § 1961," to do so, "they must specifically contract [through clear, unambiguous and unequivocal language] around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears

### III.    MOTION FOR SUMMARY JUDGMENT AGAINST THE INDIVIDUAL DEFENDANTS

#### A. Standard of Review

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 322; *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir.2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to

---

for post-judgment purposes." *In re Riebesell*, 586 F.3d 782, 794 (10th Cir. 2009) (citations and internal quotation marks omitted).

prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### B. Discussion

#### 1. Breach of Guaranty

Midas seeks summary judgment on its claim that the Individual Defendants breached the Guaranty by failing to pay the sums owed under the Franchise Agreement, including the $13,587.10 delinquency, as well as liquidated damages owed under the Agreement. ECF No. 35 at 10–11. "A guaranty agreement is a contract under which the guarantor promises to perform the obligations of the principal if the principal fails to perform." *CapitalSource Fin., LLC v. Delco Oil, Inc.*, 608 F. Supp. 2d 655, 662 (D. Md. 2009) (citing *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306 (Md. 1985)). A guaranty agreement is interpreted using ordinary principles of contract interpretation, and thus, "when the language of the [guaranty] is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Gen. Motors Acceptance Corp.*, 492 A.2d at 1310.

Here, the Guaranty provided: "[The Individual Defendants], for value received, unconditionally guarantees to Midas the prompt payment in full when due or declared due . . . all indebtedness, liability or liabilities . . . now or hereafter owing or to become owing by [Poulah] to Midas" and that they further "guarantee[] to Midas the prompt, full, and faithful performance and discharge by [Poulah] of each and every one of the terms, conditions, [and] agreements . . . on the part of [Poulah] . . . to Midas . . . ." ECF No. 35-1 at 49. By entering such agreement,

15

therefore, the Individual Defendants agreed to become liable to the same extent Poulah would be liable for any delinquency or damages that would arise under the Franchise Agreement. *See id.*

In opposing Midas' Motion, Kadjemse and Djeutcha do not dispute that they agreed in the Guaranty to be personally liable for Poulah's performance of and liability under the Franchise Agreement.[9] *See* ECF Nos. 51 & 52. Rather, they argue that Poulah did not breach the Agreement because "Midas breached the Franchise Agreement pertaining to repaying Poulah for expenses incurred in providing and paying for warranty services." *See, e.g.*, ECF No. 51-1 at 9. Specifically, according to Kadjemse and Djeutcha, Midas was obligated to reimburse Poulah for any payments made to customers to satisfy warranty claims and Midas breached this obligation by refusing to make such reimbursements. *See id.* at 2. Kadjemse and Djeutcha contend that the stated past due amount, $13,587.10, "is clearly more than offset by the unreimbursed expenses of Poulah." *Id.* at 9.

Kadjemse's and Djeutcha's responses are insufficient to create a genuine issue of material fact in multiple respects. First, and most importantly, Kadjemse and Djeutcha have failed to submit any *evidence* to support their claim of such offsets. *See, e.g.*, *Smith v. Richardson*, No. CIV.A. PWG-14-1042, 2015 WL 620579, at *1 (D. Md. Feb. 11, 2015) (citing *Celotex*, 477 U.S. 317) (emphasis added) ("If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify *evidence* that shows that a genuine dispute exists as to material facts."). Moreover, the setoffs that Kadjemse and Djeutcha contend were owed to Poulah were

---

[9] Because Tegangtchouang has failed to respond to Midas' Motion for Summary Judgment, the facts established by Midas' Motion are deemed to be "uncontroverted," but Midas "must still show that the uncontroverted facts entitle [it] to a judgment as a matter of law." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) (citation and internal quotation marks omitted).

16

only allowed under the Franchise Agreement upon written agreement by Midas. The Franchise
Agreement provides:

> [Poulah] agrees not to set off against any amounts due to Midas any claims for
> credit pursuant to warranties or Guarantees honored by Franchisee, except to the
> extent that such credits have been granted by the issuance of a written credit
> memorandum to [Poulah] prior to the dates such amounts are due to Midas.

ECF No. 35-1 at 31. Kadjemse and Djeutcha have not argued, nor have they presented any
evidence, that Midas issued any such written credit memorandum allowing such setoffs.

Midas has presented sufficient evidence demonstrating that Poulah became deficient in
its obligations to Midas under the Franchise Agreement before the Agreement expired, and by
failing to de-identify the Shop as a Midas shop after the Agreement expired. *See* ECF No. 35-1 at
5–8. The Individual Defendants are therefore also liable for breach of the Guaranty to the same
extent that Poulah is liable under the Franchise Agreement. Midas is accordingly entitled to
summary judgment in its favor on this claim.

### 2. Trademark Infringement

Midas also alleges that the Individual Defendants, like Poulah, are liable for trademark
infringement for continuing to use the Midas marks after termination of the Franchise
Agreement.[10] ECF No. 1 ¶¶ 28–37. "[I]n general, an individual corporate officer or director is
not subject to personal liability simply by virtue of his office; such liability attaches only if the
corporate veil can be pierced which appropriately occurs only in certain extraordinary
circumstances." *Stafford Urgent Care, Inc. v. Garrisonville Urgent Care, P.C.*, 224 F. Supp. 2d
1062, 1065 (E.D. Va. 2002). But it is well-settled that "[i]ndividual defendants, such as
[Tegangtchouang, Djeutcha, and Kadjemse], can be liable for trademark infringement 'inasmuch

---

[10] Midas has not moved for summary judgment on its second claim for relief against the Individual Defendants,
namely, common law unfair competition. *See* ECF No. 1 ¶¶ 38–41; ECF No. 35. Presumably Midas intended to
abandon this claim for the same reasons indicated in its Motion for Default Judgment against Poulah. ECF No. 34 at
10 n. 1.

17

as they have personally participated in the unlawful acts.'" *Cava Grp.*, 2016 WL 3632689, at *5

n.11 (quoting *World Gym Licensing, Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 624 (D. Md.

1999)); *see also Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987) ("A

corporate official may be held personally liable for tortious conduct committed by him, though

committed primarily for the benefit of the corporation. This is true in trademark infringement

and unfair trade practices cases."). If, however, the individual defendant "'does not personally

participate in the corporation's [trademark infringement], general corporation law does not

subject him to liability simply by virtue of his office.'" *Bright Imperial Ltd. v. RT*

*MediaSolutions, S.R.O.*, No. 1:11-CV-935-LO-TRJ, 2012 WL 1831536, at *9 (E.D. Va. May 18,

2012) (quoting *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1144 (4th

Cir.1975)).

　　　　In its Motion for Summary Judgment, Midas argues that it is entitled to summary

judgment in its favor on this claim because "the Individual Defendants, independently and as

Guarantors of Poulah, were using the marks in connection with repairing automobiles" at the

Shop. ECF No. 35 at 12. But Midas has neither alleged nor provided evidence demonstrating

how any of the Individual Defendants personally participated in the continued use of Midas'

trademarks after expiration of the Franchise Agreement. The only evidence in this regard is that

Midas repeatedly urged Kadjemse, the manager of Poulah, to cease using the marks.[11] ECF No.

35-1 ¶ 26. This notice, however, is insufficient to establish that Kadjemse, or any of the other

Individual Defendants, "personally participated in the unlawful acts." *Cava Grp.*, 2016 WL

3632689, at *5 n.11 (citation and internal quotation marks omitted).

---

[11] Midas also submitted evidence that Poulah employees continued to use business cards displaying Midas
trademarks after termination of the Franchise Agreement, but the individual whose name appears on the business
card is not a defendant in this case. ECF No. 35-1 at 6, 61.

Midas also argues, however, that the Individual Defendants should be held liable for trademark infringement "as Guarantor's of Poulah's obligations under the Franchise Agreement." ECF No. 35 at 13. Although the Guaranty does not impute all tort-based or statutory liability for which Poulah may have eventually been found liable onto the Individual Defendants, its language does require that the Individual Defendants guaranty the *payment* of all "liability or liabilities . . . of any and every kind or nature" for which Poulah may become responsible. ECF No. 35-1 at 49. Thus, to the extent Poulah is liable for trademark infringement damages, the Personal Guaranty requires that the Individual Defendants pay such liabilities in the event Poulah fails to do so. But this responsibility to pay for damages does not establish the Individual Defendants' personal liability for trademark infringement. Thus, because Midas has not submitted evidence from which the Court could find that the Individual Defendants are personally liable for violation of the Lanham Act, Midas' Motion for Summary Judgment must be denied in this regard.

### 3. Damages

Midas' request for damages against the Individual Defendants is identical to its request with respect to Poulah. For the same reasons discussed above with respect to Midas' Motion for Default Judgment, Midas is entitled to recover from the Individual Defendants 13,587.10 in amounts Poulah owed under the Franchise Agreement, as well as accrued interest totaling $843.46, contractual liquidated damages totaling $23,500, attorneys' fees and costs, and post-judgment interest at the statutory rate. *See* ECF No. 35-1 at 4, 6–8. Even assuming, however, that the Individual Defendants were personally liable for trademark infringement, treble damages could not be awarded because Midas has failed to submit any evidence respecting the amount of

19

damages to which it would be entitled under the Lanham Act. *See*, *supra*, Part III.B.3. Thus, Midas' claim for damages is granted, in part, and denied, in part.

IV.     **CONCLUSION**

For the foregoing reasons, Midas' Motions, ECF Nos. 34 & 35, are granted, in part, and denied, in part. Specifically, Midas' Motion for Default Judgment is granted with respect to liability, and granted, in part, and denied, in part, with respect to damages. Midas' Motion for Summary Judgment against the Individual Defendants is granted with respect to liability and damages for breach of the Guaranty, but is denied with respect to liability and damages on Midas' claim of trademark infringement. Judgment will be entered in favor of Midas and against Poulah and the Individual Defendants, jointly and severally, in the amount of $37,930.56, exclusive of attorneys' fees and costs. A separate Order follows.

Dated: August  29 , 2016

GEORGE J. HAZEL
United States District Judge